# OYER AND TERMINER,

## NEW YORK, MARCH, 1824.

The People ⎫
        vs.      ⎬ MURDER.
John Johnson. ⎭

Present—Hon. *Ogden Edwards*,
        Hon. *Richard Riker*, Recorder.
        Ald. *King, Zabriskie, Parker*, and *Doughty*.

*Hugh Maxwell*, Esq. District Attorney, Counsel for the
        People.

*Price, Dr. Graham*, and *Mc Ewen*, Esqrs. Counsel for
        the Prisoner, assigned by the court.

The Court opened at 11 o'clock; the Grand Jury were
sworn and charged, and the Petit Jury called, and their
excuses heard.

N'W YORK,
March, 1824.

The People
v.
Johnson.

Where separate and distinct felonies
are charged in different counts in the same indictment, the court have a discretion to com-
pel the prosecuting attorney to elect the counts he intends to rely upon.

The court will not interfere unless the prisoner is embarrassed in his plea or chal-
lenges, in consequence of the separate felonies charged in one indictment.

Alleging in the several counts of an indictment that the prisoner feloniously killed, &c.
A. B. C. D. and E. F., when the person who was charged to have been murdered was
called by each of these names, is not such a case as will embarrass the prisoner in his
pleas or challenges, or in which the court will interfere.

Decision of the court upon interrogatories to be put to jurors.  See page 367.

Neither the court or counsel are concluded by interrogatories put to jurors.  Their
competency must be settled by triers.

It is no objection to a juror, that he has heard reports of the subject matter to be tried,
nor even if he has made up his mind upon it; if he is able to find a verdict upon the
testimony offered at the trial, independent of such reports, he is a good juror.

There is no law in this country requiring the presence of counsel at the examination
of a prisoner.

It is no objection to reading the examination of a prisoner (who denies it to be free
and voluntary at his trial) that he was taken out of prison to the dead body of the person
he was charged to have murdered, and was requested by the officer to touch the body,
and did so; and from thence was taken to the examining magistrate in excessive pertur-
bation of mind, and there confessed all the particulars of the murder.  *Parol* evidence
of facts disclosed by third persons, in the presence of the prisoner and assented to by him,
cannot be given in evidence if it appears that the prisoner was at the time under ex-
amination.  It should make part of the examination itself.

N'W YORK.
March. 1824.

The People
v.
Johnson.

*Richard Hatfield, Esq.* Clerk. Johnson, stand up and hold up your right hand.

The prisoner was charged in an indictment as follows: "*City and County of New York, ss.* The jurors of the people of the state of New York, in and for the body of the city and county of New York, upon their oath present, that John Johnson, late of the first ward of the city of New-York, in the county of New York aforesaid, labourer, not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, on the twenty-first day of November, in the year of our Lord, one thousand eight hundred and twenty-three, with force and arms, at the first ward of the city of New York, in the county of New York aforesaid, in and upon one James Murray, in the peace of God, and of the people, then and there being feloniously, wilfully, and of his malice aforethought, did make an assault; and that the said John Johnson, with a certain hatchet, made of iron and steel, of the value of one dollar, which he, the said John Johnson, then and there had and held in both his hands, him the said James Murray, in and upon the left side of the head near the temple of him, the said James Murray, then and there feloniously, wilfully, and of his malice aforethought, did hit and strike; and that the said Johnson did then and there give unto him, the said James Murray, by such striking of him with the hatchet aforesaid, one mortal wound of the length of four inches, and of the depth of one inch, in and upon the left side of the head, near the left temple of him, the said James Murray, of which said mortal wound, he the said James Murray, then and there instantly died; and so the jurors aforesaid, upon their oath aforesaid, say, that the said John Johnson, him the said James Murray, in the man-

ner and by the means aforesaid, feloniously, wilfully, and of his malice aforethought, did kill and murder, in contempt of the people of the state of New York, and their laws, to the evil example of all others in like case offending, and against the peace of the people of the state of New York, and their dignity."

The indictment contained eight counts, in each of which the description of the *instrument*, or the *name* of the deceased, was varied, so as to meet the proof expected to be given at the trial. He was called *Murray*, *Maury*, *Clark*, and a *person unknown*.*

*Clerk.* How say you, are you guilty or not guilty?

Before the prisoner answered,

*Price*, his counsel, called upon the District Attorney to elect the counts upon which the prisoner was to plead. He contended that the election must be made before plea pleaded, or the prisoner would lose the benefit of his objection. It appeared, he observed, from the record, that the prisoner was indicted for the murder of more than one person, and that it was clearly illegal to charge distinct felonies in the same indictment, and referred to 1 Chit. C. L. 252.

*Maxwell*, District Attorney, replied, that he was not bound to elect on which count of the indictment he intended to rely. He was aware of an authority in Chitty, vol. 1. p. 252. which seemed to warrant the doctrine contended for by the counsel for the prisoner, but he could satisfy the court by a reference to other books and cases, that the dictum in Chitty was unsupported by the very cases he referred to.

Mr. *Maxwell* read from 1 Chitty's Criminal Law p. 252; and from 3 T. Rep. p. 103. Young's case, he read

---

*The deceased was a stranger, who had but a few days before arrived in this city from Boston, and some uncertainty existed as to his true name, hence the necessity of the different averments in the indictment.

N'W YORK,  lord Kenyon's, Justice Ashurst's, and Justice Buller's opin-
March, 1824.  ions, to show the court would not quash an indictment
The People  even when distinct and separate felonies were laid in it.
v.  He also read the case of the King v. O'Coigly, St. Tr. vol.
Johnson.  26. p. 1203.    After observing upon these cases, the counsel
remarked, there were others he might refer to, but he
thought it unnecessary; they were all contrary to the dic-
tum in Chitty, and concluded by observing, that they had,
no analogy to this case.    He had indicted Johnson but for
one offence, to wit, the murder of James Murray.    That
it was well known to the court, that it was often necessary,
to vary the name of the person supposed to be murdered,
in order to meet the proof expected to be offered.    There
was but one charge, and that modified to meet the circum-
stances of the case.    In this case it was indispensable; it
arose from the uncertainty of the name of the deceased,
and could not be avoided.    Here, he observed, is a man
murdered in a foreign country.    He was a perfect stranger
in the city ; some called him by one name, and some by
another, and it was necessary to lay it so in the different
counts.    That there was nothing unreasonable in the rule
must be apparent.—Suppose a child murdered upon the
wharf, and thrown into the river, and it was not known
whether it was a male or female ; would it not be neces-
sary to charge it as a male child, and also as a female
child, in the indictment ?

Mr. *Price.*   The situation I stand in is none of my seek-
ing.   I am here to defend a man on a charge of mur-
der.   I should feel myself guilty of that crime if I neg-
lected to make all legal objections that are calculated
to serve the interest of my client.   The application be-
fore the court is to compel the District Attorney to spe-
cify the counts the prisoner is to plead to.   The District

Attorney contends that he cannot be compelled to elect upon which of the counts he intends to offer evidence, because it is apparent to the court, that he intends to offer evidence against the prisoner, but for the murder of *one person*, and of course of but one offence. But how is the court to know this? They know nothing of the case but what they have learned from the record, and by that instrument it appears the prisoner is charged in one count for the murder *James Murray*, and in another for the murder of *Timothy Murray*, &c. How does it appear to the court they are the *same person*? It is extremely important to the prisoner that he knows the charge against him, in order to frame his plea to meet it, and to have the benefit of challenges. I make this application to the court; they are to dispose of it as the solemn nature of the case now before them requires.

*The Court.* Without entering farther into the law, the opinion of the court is, that they have discretion, and may compel the district attorney to select the counts in the indictment he intends to rely upon.* That it was a

*N'W YORK,*
*March, 1824.*

The People
v.
Johnson.

---

*The words of justice Buller in Young's case (3 T. Rep: p. 106.) are as follows:—" But if it appear, before the defendant has pleaded or the jury are charged, that he is to be tried for separate offences, it has been the practice of the judges to quash the indictment, lest it should confound the prisoner in his defence, or prejudice him in his challenge of the jury. For he might object to a juryman's trying one of the offences, though he might have no reason to do so in the other, but these are only matters of prudence and discretion. If the judge who tries the prisoner does not discover it in time, I think he may put the prosecutor to make his election on which charge he will proceed. I did it at the last sessions at the Old Bailey, and hope that in exercising that discretion, I did not infringe on any rule of law or justice. But if the case has gone to the length of a verdict, it is no objection in arrest of judgment. If it were, it would overturn every indictment which contains several counts."

N'W YORK, discretion to be exercised upon a full view of the case.
March, 1824. Where it appeared to the court that distinct and separate
The People offences were charged in one indictment, which confused
v. the prisoner in his pleas and challenges, they would give
Johnson. him relief by compelling the District Attorney to elect
upon which count he intended to rely. Here it is obvious
the indictment contains but one charge, although modi-
fied to meet the proof in the different counts. The court
can see no hardship upon the prisoner in this case. Their
opinion, therefore, is, that the prisoner must plead to the
indictment.

  *Clerk.* John Johnson, are you guilty, or not guilty?
  *Pris.* Not guilty.
  *Clerk.* Are you ready for trial.
  *Pris.* Yes. Will be ready to-morrow morning.
  *Clerk.* Have you counsel?
  *Pris.* Yes.
  *Clerk.* Do you wish the court to assign you more?
  *Pris.* No.
  The court adjourned to Tuesday morning, at 11
o'clock, A. M.

TUESDAY, MARCH 16.

  The court met at 11 o'clock, A. M.
  Present—The same justices as yesterday.
  From the very great crowd in the room and in the ave-
nues to the Hall, all the witnesses on the part of the
people did not answer when called.
  Mr. Maxwell observed, that it would be impossible for
him to proceed, until the witnesses came in. He had no
doubt they were among the crowd, but could not get in.
  The court directed the panel to be called, and by that
time it was supposed the witnesses would come.

The court directed the clerk to swear the gentlemen, upon the panel who had belonged to the artillery, and who were suspended yesterday. The court decided that artillery-men are not exempted by the statute to serve as jurors after they cease to be artillerists.

N'W YORK,<br>March, 1824.<br>The People,<br>v.<br>Johnson.

The petit jury were then called, and the challenges made. The prisoner made peremptory challenges, and challenges for favour.

Albert D. Spear was called, and Mr. *Price* prayed the following questions to be put (as in Selfridge's case,) to each juror, as he came to the book to be sworn. 1st. Have you heard any thing of this case? 2d. Do you feel any bias or prejudice for or against the prisoner in this case?

*By the Court.* The only object of interrogating jurors is to ascertain whether they are prejudiced for or against the prisoner. The court or the counsel for the prosecution would not be concluded by the answer. The question of competency must be settled by the triers appointed according to law. The court do not mean to sanction the particular mode now suggested. You may however ask the questions.

Recorder *Riker* referred the counsel for the prisoner to Milligan and Welchman's case, for robbing the Phœnix Bank, City Hall Rec. vol. 6. p. 71.

On advisement among the members of the court, they adopted the questions put in Milligan's case. The questions were,

1st. Have you, at any time, formed or expressed an opinion, or ever entertained an impression which may influence your conduct as a juror?

2d. Have you any bias or prejudice on your mind for or against the prisoner?

N'W YORK,
March, 1824.

The People
v.
Johnson.

3d. Do you, in every respect, according to the best of your knowledge or belief, stand perfectly indifferent between the people and the prisoner.

*Price* requested the court to so frame the interrogatories that the answer in the affirmative or negative would embrace the case, and preclude farther questions.

*By the Court.* The prisoner must be tried according to law. We cannot frame any question to preclude explanatory ones being put by either party. The court cannot decide upon the competency of the juror. If challenged for favour, triers must be appointed. The juror was challenged for favour by Mr. Price. The court appointed John Anthon and Charles King, Esqs. to decide upon the competency of the challenged juror.

The triers were sworn well and truly to try the juror, to answer the questions put to him.

*Price* put the questions. Have you formed and expressed an opinion, or ever entertained an impression which may influence your conduct as a juror, &c.? as in Milligan's case.

Mr. Spear answered he had unfavourable impressions against the prisoner. I have read his confession.

*Mr. Maxwell.* Notwithstanding your impressions, and what you have heard, is your mind free to make up a verdict upon the evidence that will be offered, exclusive of what you have read and heard?

*Price.* In a case involving the life of a person, the juror should be free—his mind should be as a blank piece of paper. The juror himself can hardly know his own bias. Mr. Spear has read the confession of Johnson in a handbill, circulated through the town by some person. A great many persons have been summoned as jurors—is it not possible to obtain an impartial jury? I do not mean a jury who have never heard of this case, but a jury

N'W YORK,
March, 1824.

The People
v.
Johnson.

who are impartial. We can certainly find such a jury notwithstanding the excitement.

*Maxwell.*—If the doctrine contended for by the counsel for the prisoner were adopted, every culprit would go unpunished. Jurors feel as men. That they feel a prejudice against the enormity of a great crime is natural. It is not a prejudice or bias against the man, but against the offence. What would be the consequence of such a doctrine if sustained by the court? The party himself might excite and keep alive those prejudices. In that case he never could be tried at all. The juror says he has heard the reports of the murder, and has read the handbill detailing the confession; but he nevertheless says he is competent to render a verdict upon the evidence. With the greatest respect, I think Mr. Spear is a competent juror.

*By the Court.*—A juror must approach the box with impartiality. The opinion that the juror has made up his mind may be predicated upon a hypothesis that if the report is true or not true, the prisoner is guilty or not guilty. The mere circumstance of a juror having formed an opinion upon reports and newspaper publications, is not an objection against him. If a juror is able to make up a verdict upon the testimony offered on the trial, independent of the reports he has read and heard, he is certainly a good juror.

*Clerk*, to the triers. How say you, do you find the challenge true or not true?

*Triers.*—Not true.

The juror was sworn.

The prisoner challenged eighteen jurors peremptorily, and twenty-two for cause shown.

And the following jurors were sworn. Robert Stod-

N'W YORK,
March, 1824.

The People
v.
Johnson.

dard, Joseph Middlemast, Timothy Kellogg, Richard Harding, Barnet Audariese, William Hitchcock, Dennis Ward, John Degez, James L. Bleecker, Alexander Robertson, Isaac L. Jaques, and Michael Immanuel.

*Mr. Maxwell.* Gentlemen of the Jury, The prisoner is now to be put upon trial for the crime of murder—a crime against the laws of God and man. In a crime of such a deep dye, it is necessary that satisfactory evidence should be offered—that the prisoner should have a fair trial. But however anxious the counsel for the prisoner may be to find some difficulty, some doubt in the case, it is my duty, gentlemen, to say to you, that the proof will be of so satisfactory a nature, that you will find little or no difficulty in the investigation of it. The witnesses against the prisoner are all people of good character—they are strangers to him—have no malice or ill will to gratify. They will develop such a chain of facts and circumstances, that nothing but the hand of a superintending and all-wise Providence could have brought to light, as if for the detection and punishment of this foul murder. It would appear that the deceased was a young man of good character. He was not a native of this country. Had just come from Boston, where, by honest industry, he accumulated upwards of $300. He arrived here in the sloop Fulton, on Tuesday the 18th of November—slept on board the sloop until Thursday. It would appear by the testimony of Young, the steward on board the sloop, that he saw Johnson on the wharf on Wednesday, speaking to the deceased, and that he came again on Thursday, and assisted the deceased to carry away the trunk. The deceased told Captain Morehouse, the captain of the sloop, that he was going to board in the lower part of the city. It would appear by the testimony, that the deceased left the vessel on Thursday, and the people on board neither saw or heard

of him until Sunday, when the dead body was immediately recognized by them as the body of Murray. Under the direction of an all-wise Providence, I shall be able to fix the guilt of this murder upon the prisoner, beyond all doubt —not only by the testimony of the people on board, but by the officers of the police who arrested Johnson and searched his premises—from the circumstances of the case, and from the confession of the prisoner himself. .

On Sunday, the officers took Johnson as he was coming from church, where he had been, I hope, to worship ! He was arrested by Mr. Hays, and while under arrest, as the steward of the sloop Fulton was approaching in order to identify him, the prisoner exclaimed, " this scares me."' The prisoner was brought to the police office and was examined. He denied all knowledge of the deceased— had never been at his house—knew nothing of his chest. While Johnson was under examination, the officers of the police searched his house, found a bloody sheet, truss and clothing, all in places not usual for those articles. On Monday Mr. Kip recognized the deceased as the same person who was in company with Johnson with a chest, which they employed him to carry to Johnson's house.

Mr. Maxwell then detailed the circumstances of finding the chest of the deceased under Johnson's bed, a bloody shirt and bloody handkerchief, the clothes of the deceased—his second examination. He also detailed the circumstances of finding the money in the sand bank at Brooklyn—the blood traced from Johnson's bed-room to the cellar—the particulars and manner of the death of the deceased—the finding of the body in Cuyler's Alley— the exhibition of the body at the hospital, and its recognition, &c.

*Mr. Maxwell* concluded, by observing he was not wil-

N'W YORK,
March, 1821.

The People
v.
Johnson.

ling, by any address to the jury, to inflame their minds against the prisoner—there could be no necessity for it, for he apprehended the jury would be under the necessity of exerting themselves to resist their feelings and indignation of such a public outrage. He, then proceeded to call the witnesses.

*Charles Miller sworn.*—Is a city watchman. On Saturday, the 22d Nov., at half past 2 o'clock, was doing duty in the neighborhood of Cuyler's Alley, and found a dead body. It had nothing on but a red flannel shirt tied around the body, and an old bolster-case tied around the head, and a white pair of drawers wrapped around them. It had a wound upon the left temple of the head. A rope was tied around the body, and another around the head. The rope around the body was slack, as if to carry it. Witness staid with the body until 2 o'clock, when the coroner came and took it away.

*Doctor Stevens sworn.*—Saw the dead body on Monday. The wound upon the left side of the head appeared to have been produced by some blunt instrument. The body had longitudinal scratches upon the chest, such as might have been produced by dragging him upon the sand or gravel. He appeared to have died in good health. Witness thinks he died in good health, from the appearances on examination. There were marks of a rupture on the right side, which the truss now produced would fit. The body might have been dead four or five days. The scalp of the deceased was not cut—the wound must therefore have been inflicted by a blunt instrument. The wound was about three inches and a half long, and two and a half wide, and it was about two inches deep—it must have produced instantaneous death.

*Doctor Rogers sworn.*—Concurs in the testimony of Dr. Stevens, in all he has said. Was present at the examination. The truss now produced would be proper for the rupture on the person of the deceased.

N'W YORK,
March, 1831.

The People
v.
Johnson.

*Elizabeth Day*, lives 16 Barclay-street. Saw the body on Monday, 24th of Nov. at the Hospital. His name was James Murray, the same person that called at her house to inquire for the Rev. Mr. Powers. He told witness that his name was James Murray, and that if the Rev. Mr. Powers called, he would know his name. The deceased was dressed in a gray coat, dark vest with spots, black silk handkerchief, and dark pantaloons. The coat and waist-coat now produced, James Murray had on when he was at the house of witness. Witness described the clothes Murray had on, before she saw them in the police office; has no doubt at all that the body at the hospital was the deceased Murray, nor that the clothes now before the court were worn by Murray when at her house.

*John Powers*, sworn, saw the body of the deceased on Sunday morning. His name was James Murray. Witness saw James Murray alive the Thursday before the Sunday he was exhibited at the alms house. Witness saw him at the Rev. Mr. Powers'. He had on a gray coat, dark spotted vest, and darkish pantaloons, the same now produced before the court.

*Doct. Powers*, sworn, is a physician. Saw the body of Murray on Sunday. It was the body of James Murray. The same person I saw at my brother's on Thursday. He had on a gray coatee, and dark vest; did not know him by any name, but others called him Murray. Is certain it is the same person who called at his brother's.

*Samuel Morehouse, Jun.* sworn. Arrived in New York, from Boston, in the sloop Fulton, in Nov. last. It was on the Tuesday preceding the Sunday on which the body was exhibited. Saw a body in the rear of the hall on Sunday. It was the body of the person who came in the sloop with me from Boston. Am certain, and cannot be mistaken. Murray staid on board until Thursday. Had a chest on board—the chest now before the court. The deceased

N'W YORK, March, 1824.

The People v. Johnson.

wore on board the sloop a gray coatee, and red shirt and grayish pantaloons; the same now produced. Does not know his name—paid his passage—was very particular about his chest—does not recollect who came on board with him, and was not intimate with any person on board.

*Dennis Ripley*, sworn. Was mate on board the Fulton —saw the dead body of a man in the rear of the hall on °Sunday. It was the body of the same person who came from Boston in the sloop Fulton with witness—saw his chest—it is the same chest now before the court. The deceased wore on board the vessel a gray coatee, grayish pantaloons, black silk handkerkief, dark waistcoat. The clothes now shown to me are the same clothes the deceased wore on board the sloop.

*Henry Young*, a black man, sworn. Is steward on board the Fulton—saw a dead body in the rear of the hall. It was the body of the person who came from Boston on board the sloop Fulton. Deceased left the vessel on Thursday in the afternoon—is certain the deceased is the person who came in the sloop. The man at the bar (Johnson) and the deceased came on board and took away a chest on Thursday afternoon. Had seen Johnson speaking with Murray on Wednesday before—Murray came on board and lifted the chest on the quarter-rails, and Johnson took hold of it. Cannot tell which way they went—they took it away in their hands. Murray had on a gray coat, dark pantaloons, and dark vest, with spots in it—the same clothes now before the court. Saw the body at the alms house—immediately recognized it. Described Johnson to to the officers of the police before he was taken.

*Cross-examined.* Johnson and deceased took away the trunk one hour and a half before sun-down on Thursday. Johnson had been there the preceding Wednesday, and had conversed with Murray. Johnson was dressed the same on

Sunday he was when he and Murray went away.   He had on a green surtout on Sunday.   The chest now before the court is the same that belonged to Murray on board the sloop.

*Thomas Kip*, sworn.   Is a cartman.   On Thursday, in the afternoon, between one and two o'clock, was at the head of Burling slip.   It was on Thursday preceding the exhibition of the dead body on Sunday.   Was sitting on Griswold's stoop—saw two men carrying a chest—one was Johnson, and the other the man whom he saw dead at the hospital.   They agreed with witness to ride his trunk to Johnson's house.   On arriving at the house, Murray pulled out his pocket book to pay witness, but had no change. Johnson said he would pay him, and borrowed the money of a boarder and paid him.   Witness cannot be mistaken —it was Johnson—he has known him five years.   The deceased was dressed in a gray coatee, and black waist-coat, the same now before the court.   Witness took particular notice of him—is sure he is the same man he saw with Johnson—recognized him immediately when he lay dead in the hospital.

*Mary M'Glochlin*, sworn.   Lives at No. 64 Front street, directly opposite Johnson's house—remembers the Thursday evening preceding the exhibition of the dead body on Monday in the hospital—there was a light on Thursday evening in Johnson's room at half past 12 o'clock—it is an unusual thing in that house—they are in the habit of retiring to bed at 9 or ten o'clock.   One of the window shutters was open—could see into the room, but not where the bed stood.   Might see a person walk across the room.

*Jacob Hays*, high constable, sworn.   I arrested Johnson on Sunday as he was returning from church.   I told him I wished to speak to him, and as Young, the steward of the sloop Fulton, was coming up to us in company with Mr. Maxwell, Johnson exclaimed, "this scares me."   Witness

N'W YORK, March, 1824.

The People v. Johnson.

then had him by the hand—told him not to be frightened. Witness took him to the police office. He never said to Johnson it would be better for him to confess. Took him to see the dead body, and requested him to touch it. Was very much agitated. Brought him to the police office, where he confessed to the magistrate.

*George A. Raymond*, sworn. Went to Johnson's house with Mr. Homan, traced the blood from the room to the store, and down the stairs into the cellar—there were spots of blood on the ladder which leads into the cellar.

*Mr. Homan*, sworn. Examined Johnson's house, crawled into a hole in the cellar, it was not more than three feet wide, but ten or 12 feet long, just large enough to admit the body of a man; in the extreme end of this hole, he found a bloody sheet, and a truss. On Monday found a bundle of clothes behind the woodpile in the yard; they were very filthy, apparently just taken from the sink of the necessary—found the chest up stairs under Johnson's bed—traced the blood out of the room down the stairs into the store—turned down the bed clothes, and found the bed wet with water and blood, and fresh spots of blood appeared on the head-board.

*Azel Concklin*, sworn. Witness examined the room in which the supposed murder was committed—there was blood upon the carpet and upon the stairs. Witness found in the bar below, a chest which contained dirty clothes, a shirt covered with clots of blood, and a cravat also very bloody.

Justice *Hopson*, sworn.

*Maxwell.* Have you any money in your possession found in Brooklyn?

*Witness.* I have $380 in specie.

*Maxwell.* How did you become possessed of that money?

*Price.* I object to the inquiry—it may lead to improper testimony.

*Maxwell.* I shall offer nothing in evidence against the

prisoner, but what came from third persons in his presence, and was assented to by him. I wish to show the court, that after the confession was made, Johnson was asked what he had done with the money ;[*] that he said he gave it to his daughter ; and she, upon being sent for, said she gave it to her brother ; and on his being sent for, said he had secreted it in the sand hills back of Brooklyn ; and this being said in Johnson's presence, he requested his son to go with the officers for it, where it was found.

*Price.* It must appear by the examination.

*By the Court.* Was it at the time of the examination ?

*Maxwell.* It was connected with it—it was subsequent; and read 1 Hawk. P. Cp. 1. 20. to prove he might introduce the testimony.

*Price.* I contend that it was part of the examination, and could not be separated from it.

*By the Court.* We are not sufficiently certain whether the proof now proposed to be offered is connected with the examination or not. If it was made at the time of the examination, it should have been inserted. The rule of law is well settled, that the examination must be taken together. It is the right of the prisoner to demand that the whole of his confession be taken together. The evidence was excluded, and the district attorney confined to the examination, which did not contain the facts ·in relation to the secretion and finding the. money at Brooklyn.

Doctor *Graham* objected to the reading the examination of the prisoner, on the ground that it did not state that

---

[*] The next day in the police office, to Justice Hopson.

N'W YORK,  the magistrate had apprized him that he was entitled to
March, 1824.  counsel.

The People    The court decided, that no law in this country requir-
v.  ed the presence of counsel at the examination of a pris-
Johnson.  oner.

Mr. Price then contended that the confession was not
*free* and *voluntary*. The prisoner was taken out of his
cell to the hospital by Mr. Hays, the high constable, and
was required to touch the dead body ; a circumstance cal-
culated to agitate and distract him. It was (he contended)
a species of mental torture more powerful than promises
of favour or threats and menaces. The law was well set-
tled, that the least undue influence exercised upon the
mind of the prisoner by threats or promises would vitiate
any confession made by him. Should not then a confes-
sion made under circumstances so well calculated to agi-
tate and confound the prisoner, be rejected ?

*By the Court.* The prisoner was taken to see the dead
body, and was required to touch it. He did so, and was
brought by the police officer to the police office in great
perturbation of mind, and confessed the murder. It does
not appear that any threats or promises were made to him
by the officer, or by any other person. On the contrary,
it was stated to him by Mr. Hopson, the examining mag-
istrate, that he was not bound to confess, and that his
confession might be used against him upon his trial. He
did confess, and that confession, in our opinion, was free
and voluntary. His being taken to the dead body, and
being required to touch it, does not affect the examina-
tion. What influence would such a circumstance have
upon an innocent person ? None. The guilty might be
intimidated, and tremble ; conscious innocence would dis-
regard it.

*Mr. Maxwell* then read the examinations of the prisoner. In the first examination he denied all the facts in relation to Murray. In the second he confessed as follows:

*City of New York,* ss.

" John Johnson again brought out and examined in relation to the murder of James Murray. Johnson was first told that he was to be examined, and that what he might say would be made use of against him, and in all probability it might cause his life ; that he need not answer any question without he pleased.

*Ques.* Do you know James Murray, whose corpse you have just been to see ?

*Ans.* Yes, yes, I do know him, and I will tell you all about it.

*Ques.* Where did you first meet with him ?

*Ans.* On Thursday last, I met with him at the coffeehouse-slip, and he asked me whether I was an Irishman, and I told him that I was born there ; and he mentioned about his going to New Orleans or Savannah ; and I asked him to my house, as there were a couple of men at my house who were going there, and he came and talked to Jackson and Jerry about the southward : and he stated he would stay there a few days, and wanted me to go with him and get his chest, and went and got the chest—which chest is now here shown to him from the vessel at Burling-slip ; and at the head of the slip, had it put on a cart, and taken to the house, and Jackson and Jerry were there when they came with it. I paid the cartage, as I got a shilling from Jerry to make the change. The chest was put into the back room.

N'W YORK.
March, 1824.

The People
v.
Johnson.

They all remained at home, and eat supper, viz. Jackson, Jerry, Mary, my daughter, Murray, the dead man, and myself. After supper, Murray and myself went over to the north river to look for the vessel that I expected my wife to come down in from Newburgh, at Washington market. We parted—Murray having stopped with a man, and I went home, and got home a little before Murray did. Jackson and Jerry were sitting there when I returned, and they saw Murray return; after which they sat and talked together till 10 or 11 o'clock, when Jackson and Jerry went up to bed in the back room, leaving the man, Murray, myself and daughter in the room : my three boys being put to bed some time previous. Murray said that he did not like to go up stairs with the men without his chest being taken up, as he had money in the chest. He did not mention the sum, but said he had enough to take him to the southward. I then proposed to him to go to bed with myself and take the chest up in the room; Mary by this time had gone up to bed in the bed-room. Murray and myself then took up his chest into my bed-room, the front room, and set it near the fire-place by the bed-side, and Murray undressed himself and went to bed, and I remained up, went down stairs, and set by the stove for near an hour, as I judge, and found Murray was asleep, and took a key out of his vest pocket, opened his chest, and took out a little bag of money about as big as my two fists. It was dollars, as I judged, as I did not open it, and Murray told me that he had silver dollars. It then came into my head to murder him, and I threw the bag and money into the corner of the closet where there were carpenter's tools. I then went down stairs and got a hatchet, and came up and struck Murray two blows, as I think, on the head, and he never

moved as I know of: I then put something about his head so as to prevent the blood running on the floor, and carried him down stairs into the cellar through the trap door. I then returned up stairs, took the bloody pillow and the hatchet, and went and threw them into the river. When I returned I looked about the floor for the blood, and not seeing any, went and laid down on the bed with Mary, being afraid to go into my own bed. In the morning I felt very uneasy, and my daughter Mary asked me what the matter was, and I finally took her and told her how that I had killed the man, and showed her where I had put him, and he remained there till 10 o'clock the next night: when they were all quiet, then I put a rope about the man, and carried him out and left him in the lane. I can't say what has become of the money, the clothing, or any thing else of the man. Mary cried and went on when I told her, and she said it would not have happened if her mother had been at home. I put the bloody sheet and things all into the river."

N'W YORK March, 1824

The People, v. Johnson.

JOHN JOHNSON.

*Taken the 25th of Nov.* 1823.

J. Hopson.

Doctor *Graham* commenced summing up. He contended this was a case depending entirely upon circumstantial evidence : the examination must be thrown aside. It was taken under circumstances of extreme perturbation in the prisoner. He had not the benefit of counsel— had just been to see the dead body—had touched it. In this situation he is brought to the police office—ready to confess any thing, and willing to confess every thing

NEW YORK, to save his family. The examination therefore could not
March, 1824. be depended upon. The counsel read the celebrated
The People Vermont case, where the party had confessed himself
v. guilty of murder, and the man was discovered to be alive,
Johnson. just before the day appointed for the execution. And to
show the dangerous tendency of presumptive evidence,
the Doctor read a number of cases in the appendix to
Phillips.

*Price.* Gentlemen, we have a great responsibility up-
on us—we are to pass upon the life and death of a fellow
being—we are called to take away the life of a fellow
being. Need I remind you with what care and caution
you ought to proceed. I advert to it to admonish you,
that unless you have the most satisfactory evidence of the
prisoner's guilt, for your own peace here, and for your
security hereafter, you will not take away this man's life
without the most satisfactory evidence. It has been doubt-
ted by many great men whether it could in any case be
taken by the creature, it being the gift of the Creator.

The counsel adverted to the fact of Johnson's former
good character, and contended it was against the nature
of things for a man to plunge into the depth of wickedness
at once—he proceeds by degrees. And argued the improb-
ability of the guilt of the prisoner, from the enormity of the
crime.

He contended, independent of the examination, there
was not sufficient evidence to convict. Little reliance
could be placed on the examination—it was no doubt
made under the most excruciating agony of feeling—made
to save his family—made after his return from laying his
hand upon the dead body of the man charged to have been
murdered. He referred to the Vermont case—it was no
bug-bear, no man ever doubted it.

The counsel then attempted to show a discrepancy be-
tween the testimony of Young, the steward, and Mr.
Kip.   He also remarked upon the favorable circumstance
of the window shutters being open, and concluded no man
in his senses would  commit so foul a crime  with the win-
dow open.   He also  remarked upon the  expression used
by  Johnson, while in the  custody of Mr. Hays, at the ap-
proach of the steward—" It scares me."

The  word guilty  is  easy  pronounced, but  its  effects
are irrevocable ;  for let it not be  whispered  to you that if
you pronounce him  guilty, there is  aught  can  save  him
from  execution.    No, gentlemen ;  I say,  if he has been
guilty of the murder imputed,  he has-committed  a  deed
of  deep,  bloody,  and  unprovoked  malice,  meriting  all
punishment.    If he be  guilty, gentlemen, he has by this
one act contradicted a life of excellence.    You have heard
from witnesses you cannot  discredit that his  past  life has
been  without reproach.    It is not in  the  course  of nature
thus suddenly to plunge into guilt ;  it is the work of time,
and no man  ever  was at the  outset  an accomplished  vil-
lain.    This man had  every. inducement to  be otherwise
—a good character, acquired  through a long life ;  in pos-
session of  large means, with a  wife and children  around
him.    Would he have thrown from him all these blessings,
his peace here and his hopes hereafter, for the indulgence,
at such hazard, of the passion of  avarice ?    It is  almost
incredible.    The  counsel then went on to comment on
the evidence,  laying  particular stress  on the fact that the
two men, Jackson and Jerry, said to have been in John-
son's house  at the same time with the deceased, have not
been  called ;  no account has been given of them ; no assu-
rance  that, reckless villains as they  may be, they  have

N'W YORK, March, 1824.

The People.
v.
Johnson.

not fled with the consciousness of guilt from the possibility of punishment. If the proof were irresistible, which it is not, that the deceased was murdered in the prisoner's house, it would by no means follow that the prisoner was the murderer. Then as to identity, it is one of the most difficult cases in the world to establish, and in a famous case from Haverstraw, tried in our old city hall, was demonstrated. Yet, to the identity of Johnson as being alongside the sloop on Wednesday, we have no positive evidence but that of the steward, though the captain, mate and working people around them, had no recollection of seeing him. He had never seen the prisoner before, never spoken to him, yet he identifies him, and not only identifies his person, but his clothes, and not only his clothes when without, but when covered with a surtout. The witness, I hope, believed that he stated—but if he did, it only shows you, gentlemen, what a witness may state as a fact, what the jury would find it difficult to receive as such.

But the prisoner has confessed, it is said: confessions freely made are the highest evidence—but under threat or hope, or under any undue excitement, ought never to be received. But what was his condition? Torn from his family on a Sabbath day, thrust into a loathsome prison, his wife cast into the same prison—his daughter, just entering into life, incarcerated there too—his little boys scattered, God only knows where. After passing two nights, thus harrowed in heart and spirit, he is taken to the hospital, to gratify some absurd theory, to see if by his touch, the dead body will not bleed afresh! .Thus harrowed, thus tortured, he is carried to the police office, and there falling on his knees, says he will confess all, confess every thing. And this is called free and volun-

tary confession ! A promise of reward, however trifling, will vitiate any confession, and yet this mighty working on the mind is to be held as not affecting this case. I do not refer to the Vermont case as a bug-bear, but put it solemnly before you. as an instance in which a man confessed himself guilty of murder, when none had been committed. Here murder has been committed, but the confession is possibly not less false. · Here I commit this cause, gentlemen, to you. I ask no perjured verdict at your hands—but, as you are accountable beings, if you entertain a doubt, I invoke the benefit of it on the side of mercy and human life.

*Mr. Maxwell* commenced by observing, if ever there was a case where the evidence was of that conclusive nature that left no doubt in favour of the accused, this was one. He had never known a case where all the circumstances so harmonized. It might be true that innocent men had suffered ; but because it is possible, and may at some time or other have occurred, is John Johnson to embrue his hand in the blood of a stranger with impunity ? Is Johnson to be thought innocent, because an innocent man *may* have suffered ?

He then remarked, the jury were bound to judge the case according to law—that the throne of mercy was not in this hall. Here we are bound by the principles of law, and in accordance to them we must decide. The executive may pardon, if the object is thought worthy the exercise of this power.

He then remarked upon the evidence : there was a singular consistency in the testimony of all the witnesses. The testimony of Young, the steward of the sloop, must be

N'W YORK, satisfactory as to the identity of the prisoner—his calling
March, 1824. at the sloop on Wednesday and Thursday, and what took
The People place on Sunday, when Johnson was arrested.
v.
Johnson.      He replied to *Mr. Price's* remarks upon Young's testi-
mony, and upon the fact that the window shutter of John-
son's bed room was open on the night of the murder. He
observed that Mrs. Johnson had gone to Newburgh, and
might have left it open, or that perhaps the deceased, be-
ing a stranger, and wanting to rise early in the morning,
had opened it himself.

He observed the confession was perfectly free and
voluntary. The magistrate testified that he had given
him all and more than the necessary caution. The
magistrate indeed had to restrain him ; to such an extent
had a guilty mind been operated upon, by a consciousness
of its own crimes. The fact of the prisoner's being taken
to, and touching the dead body, could not be used as an
argument against the validity of the examination. If he
was an innocent man what had he to fear. He made the
confession just read without any advantage being taken
of his situation ; he did not even know his wife and
daughter were in gaol. You, gentlemen, are called here
under the solemnity of your oaths, to do justice accord-
ing to law and evidence ; and if those laws and evidence,
with your oaths, require, that for a particular crime life
shall be forfeited, you must go straight on. You are
not here to legislate—not to exercise the prerogative of
mercy, but to find a verdict on the facts detailed before
you. (The district attorney here commented upon the
arguments used by the prisoner's counsel ; and then ad-
verted to as a fact that could not be explained, but to the
disadvantage of the prisoner, that his counsel had not

called to exculpate him, if he could be exculpated, his daughter, the witness, of all others, that could best establish his innocence.) For the prosecution this witness could not have been introduced, without violating the feelings which belong to us all; but in *defence* of a father, her filial affection, her highest obligation would have prompted her at once to appear as her father's vindicator; it is happy this daughter was not introduced; it would have led to a scene which we should never have forgotten. As to the effort to invalidate the testimony of the coloured man, because he and Kip differ as to time; and again because he had said he could identify the clothes, though prisoner wore a surtout, the district attorney had examined and refuted them.

Mr. Maxwell here went into a particular detail of the evidence, and concluded by remarking, that if the jurors of our country were to disregard testimony of such a character as that now before the court, there was no safety for the lives of individuals. If strangers coming into our city are to be inveigled into houses, apparently for their accommodation; and when in the house, where they suppose themselves entitled to protection, to be robbed and murdered, there could be no security for life or property.*

### CHARGE OF THE COURT.

EDWARDS, J. Gentlemen of the Jury—The high and responsible duty now to be exercised by you, is the most sacred and awful that a fellow citizen can

N'W YORK,
March, 1824.

The People
v.
Johnson.

---

*It is not pretended that I have given even an outline of the gentlemen's speeches—they were much admired. I have condensed the testimony of witnesses, and the speeches of counsel, in this memorable case, as much as possible.

N'W YORK,
March, 1824.

The People
v.
Johnson.

be compelled to perform. It is a duty of the greatest importance to society, and which is necessary to be exercised for their protection and safety. You must be so impressed with this feeling as to make it unnecessary for me to remark any farther upon it. You are called to pass upon the life of a fellow being. You must decide between the people of the state of New York and John Johnson, the prisoner at the bar. You are called upon to pass according to the evidence before you, devested of any thing you may have heard out of doors.

His Hon. then detailed the evidence to the jury. On Saturday the 23d of November, a man was found in Cuyler's Alley, by Mr. Miller, the watchman ; the situation and circumstances of the body were such as to induce a well-grounded belief the man had been murdered. The particular state of the body and circumstances of it (here the judge stated the particulars of the evidence.)—The body was watched by Mr. Miller until the Coroner was sent for, when it was removed to the hospital, where it was seen by Mrs. Day, Young the steward, and others— they recognized the body to be James Murray, who had just arrived in the sloop Fulton, from Boston, and was at the sloop on Thursday in good health. It is certain he was murdered : the next inquiry is, who is the murderer ? It appears by the testimony of Young, the steward, that Johnson came to the sloop on Wednesday and talked to Murray, and came again on Thursday, and he and Murray took away the trunk of the latter. It also appears . that Mr. Kip carried the trunk to Johnson's house, which was the last place the deceased was seen at alive. (Here his honor stated the testimony in relation to the bloody clothes found in the house, the clothing found behind the

wood pile, and the testimony of Mr. Homan and others,

police officers.)

It is your duty, gentlemen, in a case of this kind, to make every reasonable allowance, and put upon the transactions, as they have been disclosed, the most favour- able constructions that can in any way benefit the pris- oner. It is your duty in considering the case, to test the witnesses, to test their accuracy, to give every cir- cumstance in favour of the prisoner as much weight as in your judgment it ought to receive. In order to the clear understanding of this case, I will read to you the first examination at the police office. (Here the judge read the first examination of the prisoner, commenting upon, and explaining it to the jury.)—With respect to the last examination, the law is, that if it was made under any threats or promises whatever, it cannot be received in evidence. In this examination it does not appear that any threat or hopes were held out to the prisoner. But, how- ever, should you think that he made this confession under any frenzy of mind, from the effects of guilt, and anguish, and sufferings which he could no longer endure, then it is admissible in evidence against the prisoner, and is entitled to full credit.

I do not know that it is my duty, or that it is necessary for me to enter more fully into the testimony.

In the close of my remarks, I shall observe, that on the one hand you have the life of a fellow being in your hands, and on the other you have a community to pro- tect. Your course must necessarily be straight forward. You cannot turn either to the right or to the left, with- out doing great injustice to the prisoner, on the one hand, and to the community, on the other. You will, when you retire from these benches, take the subject into your

N'W YORK, consideration, and report the matters as you find them, March, 1824. under all the circumstances of the case.

The People v. Johnson.

With respect to mercy, gentlemen, this is not the mercy-seat. That attribute is in the hands of the executive. If he is a proper subject for mercy, it rests with the executive to extend it. Your duty, gentlemen, is to say whether the prisoner at the bar is or not guilty of the murder laid to his charge. With these remarks, gentlemen, I submit the case to your consideration.

The jury then retired, and in about ten minutes, viz: at a quarter after two o'clock in the morning, returned with a verdict of GUILTY. He was executed.

# OYER AND TERMINER.

## NEW YORK, MARCH, 1824.

The dying declarations of a party murdered may be given in evidence when made under a full belief that he will not survive.

Perhaps they may be receiv'd when there is a faint and lingering hope of recovery by the sufferer.